UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ALTERSEEKERS, INC. d/b/a Trepoint,

                 Plaintiff,

     -against-

BRANDFORCE SF, LLC,
DAVID FLAHERTY,
BRANDFORCE HEALTH, INC.,

              Defendants.
-------------------------------------------------------------X

**ORDER**
12-CV-5392 (SJF)(GRB)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★  SEP 1 6 2013  ★

**LONG ISLAND OFFICE**

FEUERSTEIN, J.

      On October 25, 2012, plaintiff Alterseekers, Inc. d/b/a Trepoint ("Trepoint") commenced

this action against BrandForce SF, LLC ("BrandForce"), BrandForce Health, Inc. ("BrandForce

Health") and David Flaherty (collectively, "defendants"), asserting claims for, inter alia, breach

of contract and breach of fiduciary duty. [Docket Entry No. 1]. Now before the Court is

defendants' motion to dismiss the amended complaint pursuant to Rules 12(b)(2) and 12(b)(3) of

the Federal Rules of Civil Procedure for lack of personal jurisdiction and improper venue or, in

the alternative, to transfer venue pursuant to 28 U.S.C. § 1404(a). [Docket Entry No. 17]. For

the reasons that follow, the motion is GRANTED IN PART and DENIED IN PART.

I.     Background

      William Carmody, the President of Trepoint, and Flaherty previously co-owned an

internet marketing company called Seismicom. [Docket Entry No. 5] ("Am. Compl.") at ¶ 12.

In 2008, Carmody resigned from Seismicom, sold his equity interest in the company to Flaherty,

and formed Trepoint, a corporation organized under the laws of New York with its principal

1

place of business in this District. Id. at ¶¶ 1, 14, 15. In 2010, Flaherty formed BrandForce, a limited liability company organized under the laws of Delaware with its principal place of business in California. Id. at ¶¶ 2, 4, 18. Flaherty is President, Chief Executive Officer and sole managing member of BrandForce. Id. at ¶¶ 2, 4, 18.

In 2011, Flaherty solicited Carmody to provide internet marketing services to BrandForce's clients, and Trepoint "did a significant amount of work on various BrandForce projects." Id. at ¶ 22. In late 2011 and early 2012, Carmody and Flaherty discussed further opportunities for collaboration between their companies, and Carmody "agreed to help Flaherty jointly pitch work to a number of key account prospects." Id. at ¶ 23. While Trepoint was paid on a "vendor/sub-contractor basis" for the work it performed for BrandForce in 2011 and early 2012, Flaherty and Carmody also began discussing the possibility of forming a partnership. Id. at ¶¶ 24-25. These discussions continued through the first quarter of 2012, and in early March Carmody and Flaherty met in New York to discuss the possibility of merging their companies. Id. at ¶ 29. Flaherty also introduced Carmody to brokers in New York and told them to "explore selling a combined agency." Id.

During the week of March 12, 2012, Flaherty met with a representative of AT&T to pitch BrandForce as the marketing vendor for AT&T's "GlowCaps" venture (the "GlowCaps project"). Id. at ¶¶ 30-31. On March 16, 2012, Flaherty forwarded AT&T's request for information ("RFI") to Carmody. Id. at ¶ 33. Flaherty and Carmody discussed the value of the GlowCaps project to both Trepoint and BrandForce and "agreed that they would partner to land the AT&T deal while their merger discussions continued and would split the net profits on a 50-50 basis—either indirectly through their respective 1/2 ownership in a possible merged 'newco' entity or, alternatively through a straight split of the profits" if the merger was not consummated.

2

Id. at ¶ 34.

In March 2012, Flaherty and Carmody exchanged more than twenty-five (25) emails and "countless" telephone calls concerning their pursuit of the GlowCaps project. Id. at ¶ 35. At Flaherty's request, Carmody traveled to San Francisco to attend a conference call with AT&T, during which he was presented as Flaherty's partner and the Chief Marketing Officer of BrandForce. Id.

On April 2, 2012, in response to the RFI, Flaherty provided information to AT&T indicating that Carmody and Trepoint's employees were employees of BrandForce. Id. at ¶¶ 37-40. Carmody and Flaherty continued their discussions with AT&T regarding the "capabilities of the de facto consolidated BrandForce/Trepoint partnership/JV entity," and on April 18, 2012, Flaherty told Carmody that they had been awarded the GlowCaps project. Id. at ¶¶ 41-42.

In May 2012, Carmody and Flaherty continued their merger discussions, Flaherty requested Trepoint's financial statements and sent Carmody an agency broker's commission schedule. Id. at ¶ 43. During this time, Carmody continued to be involved in all of BrandForce's new business pitches. Id. at ¶¶ 45-46.

On June 8, 2012, Carmody, Flaherty and Flaherty's personal attorney met in San Francisco "to discuss how to formally structure their partnership arrangement," and both Flaherty and Carmody confirmed that the purpose of the planned partnership was to allow Flaherty and BrandForce to "focus on securing clients" while Carmody and Trepoint "would focus on client fulfillment," and that the "net profits of the business would be split on a 50-50 basis." Id. at ¶¶ 47-48.

On June 20, 2012, Flaherty travelled to New York to meet Trepoint's senior management team and attended meetings with brokers, during which he "explained that [he] and Carmody

3

were partners" and wanted "advice and assistance in contemplation of some future effort to try and sell the combined entity." Id. at ¶¶ 49-50. On the same day, Flaherty and Carmody attended a launch party for a client, at which Flaherty introduced Carmody as his partner. Id. at ¶ 51.

On June 21, 2012, Flaherty again met with Trepoint's employees in New York to discuss the merger. Id. at ¶ 52. After Trepoint's senior management pointed out certain obstacles to executing a merger within two (2) months, they proposed an interim joint venture agreement that would formalize the parties' partnership on the GlowCaps project and on other new client prospects that Carmody and Flaherty were jointly pitching. Id. at ¶¶ 52-53. On June 22, 2012, Carmody flew to Los Angeles at Flaherty's request to meet with GlowCaps executives, and Flaherty again introduced Carmody as his partner in BrandForce. Id. at ¶ 54.

Carmody did not receive a response from Flaherty on the proposed joint venture agreement, and on June 25, 2012, sent him a slightly revised proposal and stated the "importance of reducing the partnership agreement to writing." Id. at ¶ 55. Flaherty responded, "We have our agreement in place. What we need now is a very focused [scope of work]. I'm going to use a very select few of your team with you benefiting the most." Id. Carmody's response to Flaherty again emphasized the importance of memorializing the "50/50 partnership" and warned him against "changing the direction" of the agreement. Id. at ¶ 56.

Over the next several weeks, Flaherty resisted Carmody's attempt to get him to "sign the joint venture agreement and/or, at a minimum, to at least acknowledge the 50-50 partnership split," and the parties instead executed a "compromise interim agreement to at least enable the first phase of the AT&T services to get started" (the "interim agreement") with the understanding that Trepoint "was not waiving its claim to a 50-50% partnership . . . ." Id. at ¶¶ 58-60.

The relationship between Carmody and Flaherty deteriorated further thereafter due to

Flaherty's failure to comply with the interim agreement, continued refusal to execute the partnership agreement, and efforts to exclude Trepoint from the GlowCaps project. Id. at ¶¶ 61-65. On September 7 , 2012, in response to a protest letter from Carmody, Flaherty "openly repudiat[ed] that there was any partnership agreement regarding the [GlowCaps project], falsely represent[ed] . . . that Trepoint was a mere vendor and threaten[ed] to terminate Trepoint from further involvement in the [GlowCaps project]." Id. at ¶ 66.

While reserving its rights on the joint venture issue, Trepoint provided a "statement of work (SOW) for the next project phase in the total amount of $390,000 setting forth certain services to be provided." Id. at ¶ 67. BrandForce "countered that all of the work in the SOW should be able to be accomplished . . . for a mere $85,000," and the parties agreed on September 12, 2012 to reduce the SOW to $250,000 (the "SOW agreement"). Id. at ¶¶ 68-71. At this time, Flaherty informed Carmody that he had diverted money received in payment for work on the GlowCaps project to service other clients and to satisfy his personal debts and that Trepoint would not be paid under the interim agreement until BrandForce received the next installment payment from AT&T. Id.

Trepoint performed work under the SOW agreement over the course of the following weeks, but disputes continued to arise regarding the scope of the agreement, BrandForce's failure to pay for previous work performed, and Flaherty's refusal to acknowledge the existence of a partnership. Id. at ¶¶ 72-77. On September 28, 2012, Trepoint's counsel notified Flaherty that it was suspending performance pending payment of past-due invoices. Id. at ¶¶ 79-80. Trepoint resumed work after BrandForce wired it sixty-two thousand five hundred dollars ($62,500.00) on October 3, 2012. Id. at ¶ 81. On October 25, 2012, Trepoint again suspended work on the project due to BrandForce's failure to wire additional money as promised and

initiated the instant lawsuit. Id. at ¶¶ 82-83.

Trepoint asserts claims for: (1) breach of the alleged GlowCaps project joint venture agreement; (2) breach of the SOW agreement; (3) unjust enrichment; (4) quantum meruit; (5) promissory estoppel; (6) constructive fraud;[1] and (7) breach of fiduciary duty.

II.     Analysis

Trepoint bears the burden of making a prima facie showing that the Court has personal jurisdiction over each defendant. In re Magnetic Audiotape Antitrust Litig., 334 F.3d 204, 206 (2d Cir. 2003) ("On a Fed. R. Civ. P. 12(b)(2) motion to dismiss for lack of personal jurisdiction, plaintiff bears the burden of showing that the court has jurisdiction over the defendant."); Metro. Life Ins. Co. v. Robertson Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996). "Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction," and the Court must "credit a plaintiff's averments of jurisdictional facts as true." Metro. Life, 84 F.3d at 566; see also, e.g., In re Terrorist Attacks on Sept. 11, 2001, 718 F. Supp.2d 456, 468 (S.D.N.Y. 2010) ("Where no evidentiary hearing has been held, nor have the parties engaged in jurisdictional discovery, plaintiffs prima facie showing may be established solely on the basis of legally sufficient allegations of jurisdiction."). "If the parties present conflicting affidavits, all factual disputes are resolved in the plaintiff's favor, and the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party." Seetransport Wiking

---

[1]     "'The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of scienter upon the part of the defendant, his [or her] knowledge of the falsity of his representation, is dropped . . . and is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his [or her] confidence in the defendant and therefore to relax the care and vigilance he [or she] would ordinarily exercise in the circumstances.'" Levin v. Kitsis, 920 N.Y.S.2d 131, 135 (App. Div. 2011) (alterations in original) (quoting Brown v. Lockwood, 431 N.Y.S.2d 186, 193-94 (App. Div. 1980) (citations omitted)).

Trader v. Navimpex Centrala Navala, 989 F.2d 572, 580 (2d Cir. 1993) (internal quotation marks omitted); see also Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 163 (2d Cir. 2010) ("[W]e construe the pleadings and affidavits in the light most favorable to plaintiffs, resolving all doubts in their favor.").

"'The amenability of a foreign corporation to suit in a federal court in a diversity action is determined in accordance with the law of the state where the court sits, with 'federal law' entering the picture only for the purpose of deciding whether a state's assertion of jurisdiction contravenes a constitutional guarantee.'" Mario Valente Collezioni, Ltd. v. Confezioni Semeraro Paolo, S.R.L., 264 F.3d 32, 36 (2d Cir. 2001) (quoting Metro. Life, 84 F.3d at 567). "Thus, in resolving questions of personal jurisdiction in a diversity action, a district court must conduct a two-part inquiry. First, it must determine whether the plaintiff has shown that the defendant is amenable to service of process under the forum state's laws; and second, it must assess whether the court's assertion of jurisdiction under these laws comports with the requirements of due process." Metro. Life, 84 F.3d at 567.

New York's long-arm statute provides, in relevant part, as follows:

> As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: [1] transacts any business within the state or contracts anywhere to supply goods or services in the state; . . . or [3] commits a tortious act without the state causing injury to person or property within the state . . . , if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . . .

N.Y.C.P.L.R. 302(a). Trepoint argues that the Court may exercise personal jurisdiction over defendants pursuant to both section 302(a)(1) and section 302(a)(3).

A.    BrandForce Health

Defendants argue that Trepoint "has made absolutely no allegations in its Amended

Complaint which if credited would convey personal jurisdiction" over BrandForce Health.[2]

Memorandum of Law in Support of Defendants' Motion to Transfer Venue and to Dismiss for

Lack of Personal Jurisdiction [Docket Entry No. 18] ("Def. Memo.") at 20.  According to

Trepoint, "BrandForce Health belongs in this case as a party defendant because it merely [sic] a

special purpose entity created by Flaherty and BrandForce to attempt to evade their contractual

obligations and effect their constructive fraud against Trepoint."  Plaintiff's Memorandum of

Law in Opposition to Defendants' Notice of Motion to Transfer Venue and/or Dismiss for Lack

of Personal Jurisdiction [Docket Entry No. 20] ("Pl. Memo.") at 19.[3]

The amended complaint does not contain any allegations that BrandForce Health had

contacts with New York, and the company was not incorporated until August 2012, after the

events allegedly giving rise to the Court's jurisdiction over Flaherty and BrandForce.  Therefore,

the Court may only exercise jurisdiction over BrandForce Health to the extent it is an alter ego of

Flaherty or BrandForce.  See Transfield ER Cape Ltd. v. Indus. Carriers, Inc., 571 F.3d 221, 224

---

[2]     BrandForce Health is organized under the laws of California and has its principal place of
business in that state. Am. Compl. at ¶ 3.

[3]     Trepoint also states that "a corporate officer who affirmatively participates in a tort
committed by the corporation is normally jointly and severally liable along with the corporation
to the injured party and consistent with that is not shielded from the Court's assertion of long-arm
jurisdiction." Pl. Memo. at 19 (citing Vorcom Internet Servs., Inc. v. L&H Eng'g & Design LLC,
No. 12 CV 2049, 2013 WL 335717, at *2 (S.D.N.Y. Jan. 9, 2013)). This argument is inapposite.
The court in Vorcom only noted that the "fiduciary shield doctrine," which "provides that an
individual should not be subject to jurisdiction if his dealings in the forum State were solely in a
corporate capacity," is not applicable in New York. Id. (internal quotation marks omitted); see
also Kreutter v. McFadden Oil Corp., 71 N.Y.2d 460, 470 (1988) (holding that "it is neither
necessary nor desirable to adopt the fiduciary shield doctrine in New York"). Flaherty has not
invoked the fiduciary shield doctrine, and it has no relevance to whether the Court may exercise
jurisdiction over BrandForce Health.

(2d Cir. 2009) ("[I]n general, alter egos are treated as one entity for jurisdictional purposes.") (internal quotation marks omitted).

"When determining whether personal jurisdiction exists over an entity alleged to be an alter ego, courts apply a less onerous standard than that necessary to pierce the corporate veil for liability purposes under New York law," and "a plaintiff must establish only that one entity was a shell for the other, i.e., that one entity was subject to the complete domination of the other." Bank of Am. v. Apollo Enter. Solutions, LLC, No. 10 Civ. 5707, 2010 WL 4323273, at *4 (S.D.N.Y. Nov. 1, 2010) (internal quotation marks omitted) (citing Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904 (2d Cir. 1981); MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 63 (2d Cir. 2001)). Factors indicating that a corporation is an alter ego of another include:

> (1) the absence of the formalities and paraphernalia that are part and parcel of the corporate existence, i.e., issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own.

In re Vebeliunas, 332 F.3d 85, 90 n.3 (2d Cir. 2003) (quoting Wm. Passalacqua Builders, Inc. v. Resnick Developers South, Inc., 933 F.2d 131, 139 (2d Cir. 1991)).

Trepoint's allegations fail to address any of the foregoing indicators of an alter ego relationship. See, e.g., Bank of Am., 2010 WL 4323273, at *5. Furthermore, even if Trepoint demonstrated that BrandForce Health is dominated by BrandForce and Flaherty, the conclusory allegation, "[u]pon information and belief," that BrandForce Health is being used to

9

"misappropriate" money owed Trepoint under the joint venture agreement is not sufficient to demonstrate that Flaherty and BrandForce have abused the corporate form to "perpetrate a wrong or injustice" against Trepoint. Fed. Nat'l Mortg. Ass'n v. Olympia Mortg. Corp., 724 F. Supp. 2d 308, 318 (E.D.N.Y. 2010); see also Nat'l Integrated Grp. Pension Plan v. Dunhill, No. 11 Civ. 3652, 2013 WL 1346356, at *13 (E.D.N.Y. Apr. 3, 2013). Therefore, Trepoint has failed to adequately allege an alter ego relationship between BrandForce Health and the other defendants, and the amended complaint against BrandForce Health is accordingly dismissed without prejudice for lack of personal jurisdiction.[4]

      B.     N.Y.C.P.L.R. 302(a)(1)

"To establish personal jurisdiction under section 302(a)(1), two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." Sole Resort, S.A. de C.V. v. Allure Resorts, 450 F.3d 100, 103 (2d Cir. 2006). "'A nondomiciliary 'transacts business' under [C.P.L.R. § ] 302(a)(1) when he purposefully avails [himself] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws,'" Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 166 (2d Cir. 2005) (alterations in original) (quoting CutCo Indus., Inc. v. Naughton, 806 F.2d 361, 365 (2d Cir. 1986)), and "a claim arises from a particular transaction when there is some articulable nexus between the business transacted and the cause of action sued upon, or when there is a substantial relationship between the transaction and the claim asserted. A connection that is merely coincidental is insufficient to support jurisdiction." Agency Rent A Car Sys., Inc. v. Grant Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)

---

[4]     Given the dismissal of BrandForce Health from the case, the term "defendants" hereinafter refers to BrandForce and Flaherty only.

(citations, internal quotation marks and alterations omitted). The determination of whether a defendant has transacted business in New York is based on the totality of the circumstances, and relevant factors to be considered include: "(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York, and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; and (iv) whether the contract requires [parties] to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state." Id.

The exercise of jurisdiction pursuant to section 302(a)(1) "is proper 'even though the defendant never enters New York, so long as the defendant's activities . . . were purposeful and there is a substantial relationship between the transaction and the claim asserted.'" Fischbarg v. Doucet, 9 N.Y.3d 375, 380 (2007) (quoting Deutsche Bank Sec., Inc. v. Montana Bd. of Invs., 7 N.Y.3d 65, 71 (2006)); cf. Parke-Bernet Galleries v. FranklynParke-Bernet Galleries v. Franklyn, 26 N.Y.2d 13, 17 (1970) (holding that "merely telephon[ing] a single order" to New York does not support jurisdiction under section 302(a)(1)). Telephone calls and emails directed to New York alone generally do not satisfy section 302(a)(1) when the "center of gravity" of the transaction is elsewhere. See ,e.g., Wilhelmshaven Acquisition Corp. v. Asher, 810 F. Supp. 108, 113 (S.D.N.Y. 1993) (holding that the defendant's telephonic participation in negotiations in New York, which were simultaneously taking place in New York and London, over the sale of an oil refinery were not a sufficient predicate for jurisdiction under section 302(a)(1) because "[t]he center of gravity of the transaction was [the] oil refinery in Germany"); Maranga v. Vira, 386 F. Supp. 2d 299, 306 (S.D.N.Y. 2005) ("[C]ommunications into New York will only be

11

sufficient to establish personal jurisdiction if they were related to some transaction that had its center of gravity inside New York, into which a defendant projected himself."). However, "[c]ourts have consistently held that contract negotiations occurring in New York are sufficient to support jurisdiction when they either 'substantially advanced' or were 'essential' to the formation of a contract or if they resulted in a more solid business relationship between the parties." NWDirect Design & Mfg., Inc. v. Global Brand Mktg., Inc., No. 98 Civ. 4756, 1999 WL 493348, at *3 (S.D.N.Y. July 12, 1999); Geller v. Newell, 602 F. Supp. 501, 503 (S.D.N.Y. 1984) ("[W]hile in New York, defendant participated in extensive, substantial negotiations essential to the formation of the contractual relationship. Such purposeful pre-execution activity satisfies the § 302(a)(1) test.").

    1.  Joint Venture Agreement

  Defendants' communications directed to New York and the in-person meetings that advanced or solidified their relationship with Trepoint are a sufficient predicate for jurisdiction under section 302(a)(1) over the claims arising from the alleged joint venture agreement. After an ongoing business relationship was already established, defendants solicited Trepoint's participation in the GlowCaps project by directing more than twenty-five (25) emails and "countless" telephone calls to Carmody in New York during March 2012. Id. at ¶ 35. Flaherty then met with Carmody in New York "to discuss expanding [their] collaboration, including the potential synergies of a possible BrandForce/Trepoint partnership/joint venture" and introduced Carmody to brokers in order to explore the possibility of selling a merged BrandForce/Trepoint company. Id. at ¶¶ 22-24. Although defendants argue that these meetings were only exploratory and did not sufficiently advance the negotiations to constitute the transaction of business, Def. Memo. at 12-13 (citing ICC Primex Plastics Corp. v. LA/ES Laminati Estrusi Termoplastici

12

S.P.A., 775 F. Supp. 650, 655 (S.D.N.Y. 1991) (holding that a single meeting in New York to discuss a joint venture was insufficient to confer jurisdiction under section 302(a)(1) where the joint venture was "very much in its exploratory phase" and "the meeting, if anything, impeded the progress of the proposed joint venture")), Trepoint's allegations support the inference that the meetings substantially advanced the parties' relationship and the consummation of the alleged joint venture.

The March 2012 meetings immediately preceded Flaherty's pitch to AT&T on the GlowCaps project, and Flaherty relied upon Trepoint's involvement in the project in making the pitch, forwarding the RFI to Carmody in New York in order to incorporate Trepoint's information into the response to AT&T. Id. at ¶ 33. At this time Flaherty and Carmody also entered the alleged joint venture agreement, "agree[ing] that they would partner to land the AT&T deal while their merger discussions continued, and would split the net profits on a 50-50 basis . . . ." Id. at ¶ 34. Shortly thereafter, on March 20, 2012, Carmody participated in the conference call with AT&T that led to the execution of the GlowCaps deal. Therefore, although the alleged joint venture was not consummated in New York, it is reasonable to infer that the prospect of an eventual merger raised at the meetings helped secure Trepoint's agreement to participate in the GlowCaps project pitch and to enter the alleged oral joint venture agreement.

In June 2012, Flaherty again met in New York with Carmody and other members of Trepoint's senior management team to discuss the merger, and Flaherty and Carmody attended meetings with brokers "to obtain . . . advice and assistance in order to move forward with a future effort to try and sell" the BrandForce/Trepoint merged company. Id. at ¶¶ 49-52. Defendants argue that these meetings did not advance the parties' relationship because the discussions were only preliminary and concerns raised at the meeting by Trepoint's management

13

actually set back any merger plans. While New York courts have declined to assert jurisdiction upon the basis of meetings in New York that are "not for the purpose of initiating or forming a relationship" but rather "to alleviate problems under a pre-existing relationship," U.S. Theatre Corp. v. Gunwyn/Lansburgh Ltd. P'ship, 825 F. Supp. 594, 596 (S.D.N.Y. 1993), Trepoint's allegations support the inference that, even if the June 2012 meetings did not advance the prospect of a merger in the short term, they solidified the parties' relationship in the interim and encouraged Trepoint to continue its work on the GlowCaps project under the alleged joint venture agreement.

Therefore, Trepoint's allegations sufficiently establish on a _prima facie_ basis that its claims relating to the alleged joint venture arose out of defendants' transaction of business in New York.

　　　　2.　　SOW Agreement

Defendants argue that the Court lacks jurisdiction over claims arising out of the SOW agreement because: (1) the agreement provided that only Trepoint employees located in Kansas City would work on the GlowCaps project, Def. Memo. at 22; (2) the GlowCaps clients were located outside of New York, id. at 11, 22; (3) BrandForce supervised Trepoint's work from California; and (4) defendants never traveled to New York in connection with the agreement, either before or after it was executed, id. at 22.[5] According to Trepoint, its employees in New York (in addition to three (3) employees in Kansas City) performed substantial work on the GlowCaps project, the overall project was supervised by Carmody in New York, the work itself

---

[5]　　To the extent that defendants have intended to also direct this argument against the Court's exercise of jurisdiction over claims arising out of the alleged joint venture, it is rejected for the same reasons discussed below.

14

(internet marketing) was "national" in nature, and defendants remitted payment for Trepoint's services to New York. Affidavit of William Carmody in Opposition to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and/or for a Transfer of Venue [Docket Entry No. 19] ("Carmody Aff.") at ¶¶ 59, 77.[6]

Aside from Flaherty's affidavit, defendants have offered no evidence in support of their assertion that "[b]y explicit agreement with Carmody the subject GlowCaps project was to be performed by designated Trepoint personnel in Kansas City," Defendants' Reply Memorandum in Support of its Motion to Transfer Venue and to Dismiss for Lack of Personal Jurisdiction [Docket Entry No. 22] ("Def. Reply") at 13, and Carmody has stated in his affidavit that no such agreement existed, Carmody Aff. at ¶ 77 ("I categorically deny Flaherty's averment that he supposedly selected Trepoint's Kansas City office personnel to be the sole source of Trepoint employees to work on the AT&T GlowCaps Project . . . . There was no such agreement."). Because the Court must "credit [Trepoint's] averments of jurisdictional facts as true" at this stage of the litigation, Metro. Life, 84 F.3d at 566, the allegations in the amended complaint and Carmody's affidavit are sufficient to rebut defendants' assertion that the SOW agreement was performed entirely outside of New York. See Cooper, Robertson & Partners, LLP v. Vail, 143 F. Supp. 2d 367, 371-72 (S.D.N.Y. 2001) (stating that, "[i]n determining jurisdiction, the place of performance is more critical than the place of the execution of a contract," and holding that the

---

[6] Between July and November 2012, "Trepoint had approximately 11 employees working on project fulfillment for the AT&T deal, which services were largely performed and directed by eight (8) employees based in Trepoint's New York office . . . . The remaining three (3) employees out of Kansas City were all under [Carmody's] direct day-to-day supervision from the New York office as it pertained to fulfillment of the AT&T contract." Carmody Aff. at ¶ 59. Furthermore, "Trepoint devoted substantial New York based resources (including its employees, financial metrics, business profile and more than a thousand hours of labor) in furtherance of the AT&T related partnership/JV arrangement with Defendants." Id. at ¶ 61.

15

plaintiff made a prima facie showing that the court had jurisdiction where, inter alia, the defendant contacted the plaintiff architecture firm to form a contractual relationship, "understanding that the majority of the architectural design work for which he contracted would be performed in New York," and sent payment and correspondence to the plaintiff's New York office); cf., e.g., U.S. Theatre, 825 F. Supp. at 596 (holding that, "[w]hile the quantity [of the defendant's] communications with [the plaintiff] in New York is substantial, it is not of the requisite nature [because the plaintiff] did not intend to do business in New York. Rather, it communicated with a New York corporation in order to proceed with the demolition of its property in Washington D. C. The 'center of gravity' of the transaction, therefore, is the work in progress in Washington D.C., not a business relationship formed in New York"); Pryor, Cashman, Sherman and Flynn v. Haisfield, No. 90 Civ. 3586, 1990 WL 165687 (S.D.N.Y. Oct. 26, 1990) (holding that multiple telephone calls, correspondence and two (2) meetings in New York with a New York law firm regarding a public offering of real estate holdings in Florida were not sufficient for the exercise of jurisdiction because the defendant "did not seek out a New York forum" and the focus of the relationship "was to have no connection with New York"); Wilhelmshaven, 810 F. Supp. at 113.

Moreover, the fact that defendants did not travel to New York to specifically negotiate the SOW agreement is not dispositive. As discussed above, Trepoint's allegations demonstrate that its participation in the GlowCaps project was solidified and advanced by the communications directed to New York and the March and June 2012 meetings. According to plaintiff, the SOW agreement was executed only because defendants failed to comply with the joint venture agreement, i.e., the parties' original agreement regarding the scope of Trepoint's role in the project. Defendants' contacts with New York, which advanced Trepoint's

16

participation in the project and the alleged joint venture, were thus also essential to the subsequent execution of the SOW agreement. Therefore, Trepoint's allegations are sufficient, at this stage of the litigation, to demonstrate on a prima facie basis that the SOW agreement arose from defendants' transaction of business in New York.[7]

C.    Due Process

Having concluded that jurisdiction is appropriate under New York's long-arm statute, the Court must also determine whether exercising jurisdiction comports with the principles of due process, which "require a defendant to have minimum contacts with the forum such that 'it should reasonably anticipate being haled into court [there].'" Johnson & Johnson v. Azam Int'l Trading, No. 07-CV-4302, 2013 WL 4048295, at *4 (E.D.N.Y. Aug. 9, 2013) (quoting PDK Labs, Inc. v. Proactive Labs, Inc., 325 F. Supp. 2d 176, 181 (E.D.N.Y. 2004) (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 474 (1985))). This standard is satisfied where there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state." Burger King, 471 U.S. at 475 (internal quotation marks omitted). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." Id. (internal quotation marks and citations omitted).

The requirements of due process are satisfied here for the same reasons that the Court may exercise jurisdiction pursuant to section 302(a)(1): defendants purposefully initiated an ongoing business relationship with a New York corporation, attended meetings in New York to advance the relationship, and contracted with that corporation to perform services in New York.

---

[7]    Because the Court has determined that it may exercise personal jurisdiction pursuant to section 302(a)(1), it is not necessary to determine whether jurisdiction may also be exercised pursuant to section 302(a)(3).

See Burger King, 471 U.S. at 475-76 ("[W]here the defendant deliberately has engaged in significant activities within a State or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well."); Transclick, Inc. v. Rantnetwork, Inc., No. 11 Civ. 8171, 2013 WL 4015768, at *4 (S.D.N.Y. Aug. 7, 2013) ("'[S]atisfaction of the section 302(a)(1) criteria will generally meet federal due-process requirements.'") (quoting Sirius Am. Ins. Co. v. SCPIE Indem. Co., 461 F. Supp. 2d 155, 164 (S.D.N.Y. 2006)). Therefore, defendants should reasonably have anticipated being haled into court in New York, and the exercise of jurisdiction will not violate the principles of due process.

D.    Improper Venue

Defendants have also moved to dismiss the case for improper venue. "A civil action may be brought in . . . (1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located; [or] (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." 28 U.S.C. § 1391(b)(1), (2). For venue purposes, "(1) a natural person . . . shall be deemed to reside in the judicial district in which that person is domiciled," and a corporate defendant "(2) . . . shall be deemed to reside . . . in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question . . . ." 28 U.S.C. § 1391(c)(1), (2).

Because Flaherty is domiciled in California, venue is proper in this District only if "a substantial part of the events or omissions giving rise to the claim occurred" here. In making this

18

determination in a breach of contract action, courts consider "where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred." Matera v. Native Eyewear, Inc., 355 F. Supp. 2d 680, 686 (E.D.N.Y. 2005). Here, the alleged joint venture was partially negotiated in Trepoint's offices in New York, and the joint venture, interim and SOW agreements were, at least partially, performed by Trepoint personnel in its New York office. The negotiations and performance in this District are sufficient to establish that venue here is proper. See id. ("In the Court's view, . . . the fact that the Plaintiff's services were performed within the District is sufficient to establish that venue is . . . proper . . . .").[8]

E.    Motion to Transfer Venue

Even if venue in this District is proper, defendants have requested that the Court transfer the case to the Northern District of California pursuant to 28 U.S.C. § 1404(a) for the convenience of the parties and witnesses. See Pescorino v. Vutec Corp., No. 11–CV–6312, 2012 WL 5989918, at *2 (E.D.N.Y. Nov. 30, 2012) ("A motion to transfer venue requires a two-part inquiry: first, whether the action might have been brought in the transferee court; and second, whether transfer is appropriate considering the convenience of both the parties and the witnesses, and in the interest of justice."). "Among the factors to be considered in determining whether to grant a motion to transfer venue are . . . (1) the plaintiff's choice of forum, (2) the convenience of witnesses, (3) the location of relevant documents and relative ease of access to sources of proof, (4) the convenience of parties, (5) the locus of operative facts, (6) the availability of process to

---

[8]    Trepoint failed to respond to defendants' motion to dismiss the case for improper venue, instead focusing its argument on whether venue should be transferred for the convenience of the parties and witnesses, and therefore defendants argue that the Court should grant the motion as unopposed. Def. Reply at 21. However, even when a Rule 12(b) motion is unopposed, the Court must make a threshold determination that the moving party is entitled to the relief requested, see McCall v. Pataki, 232 F.3d 321, 322 (2d Cir. 2000), and defendants have failed to meet their burden of facially demonstrating their entitlement to dismissal for improper venue.

compel the attendance of unwilling witnesses, and (7) the relative means of the parties." N.Y. Marine and Gen. Ins. Co. v. Lafarge N. Am., Inc., 599 F.3d 102, 112 (2d Cir. 2010) (internal quotation marks omitted). Defendants bear the burden of establishing the propriety of a change of venue by clear and convincing evidence, see Pescorino, 2012 WL 5989918, at *2, and the Court has "broad discretion in making determinations of convenience under [s]ection 1404(a)." D.H. Blair & Co., Inc. v. Gottdiener, 462 F.3d 95, 106 (2d Cir. 2006).

Defendants argue that the case should be transferred to the Northern District of California because: (1) defendants are domiciled in California; (2) Trepoint has an office in San Francisco; (3) the locus of operative facts is California, "since BrandForce SF is the company contracted to do work for the Glow Cap project"; (4) defendants intend to file counterclaims; (5) thirteen (13) of the twenty (20) anticipated witnesses in this case (according to defendants) reside in California, while several others reside in Las Vegas and Texas and prefer to testify in California; (6) Trepoint's witnesses, other than Carmody, reside in Kansas City; and (7) relevant documents are located in California. Def. Memo. at 24-25. Trepoint has responded that: (1) the Court should show deference to the plaintiff's choice of forum; (2) there are more party witnesses located in New York than California; (3) the critical non-party witnesses are located in Atlanta, not California; (4) the loci of operative facts are New York, California and Atlanta; and (5) Trepoint has relatively less means to litigate outside its domiciled state, due in large part to defendants' conduct at issue in this case. Pl. Memo. at 23-24.

A plaintiff's choice of forum is given substantial consideration unless the chosen forum has "no material connection with the action." Tole v. Glenn Miller Prods., Inc., No. 12 Civ. 6660, 2013 WL 4006134, at *5 (S.D.N.Y. Aug. 6, 2013). As discussed above, there are substantial connections between this action and New York, in addition to it being Trepoint's

residence, and therefore Trepoint's choice of forum is given substantial deference.

The convenience of the likely witnesses in this case does not substantially weigh in favor of defendants. The party witnesses are divided between New York and California and, although defendants have asserted that more potential witnesses are located in or near California, the non-party witnesses essential to Trepoint's claims (rather than defendants' anticipated counterclaims) are located in New York, Atlanta or Denver. Defendants also have not shown that they would be unable to secure the appearance at trial in New York of any essential non-party witnesses.

Furthermore, as discussed above, defendants have not shown that California was the locus of operative facts with respect to their relationship with Trepoint. The fact that BrandForce, the party to the GlowCaps contract with AT&T, is located in California is not determinative in light of Trepoint's allegations that most of the work on the project was performed by its employees in New York and that the consummation of the agreements between the parties was substantially advanced by meetings in New York. Therefore, defendants have failed to establish the propriety of a change of venue by clear and convincing evidence, and the motion to transfer venue is denied.

III.     Conclusion

For the foregoing reasons, defendants' motion is denied except insofar as BrandForce

Health is dismissed from the case without prejudice for lack of personal jurisdiction.


**SO ORDERED.**

                                        s/ Sandra J. Feuerstein
                                        _____
                                        SANDRA J. FEUERSTEIN
                                        United States District Judge


Dated: September 16, 2013
         Central Islip, New York