UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X
ALTERSEEKERS, INC. d/b/a
TREPOINT,

        Plaintiff,

      -against-

BRANDFORCE SF, LLC, BRANDFORCE
HEALTH, INC. and DAVID FLAHERTY,

        Defendants.

--------------------------------------------------X

**MEMORANDUM AND ORDER**
CV 12-5392 (GRB)

**GARY R. BROWN, United States Magistrate Judge:**

Plaintiff Alterseekers, Inc. d/b/a Trepoint ("plaintiff" or "Trepoint") commenced this action against BrandForce SF, LLC ("BrandForce"), BrandForce Health, Inc. ("BrandForce Health") and David Flaherty ("Flaherty") (collectively "defendants") asserting claims for breach of partnership/joint venture agreement, breach of contract, unjust enrichment, quantum meruit, promissory estoppel, constructive fraud, breach of fiduciary duty, tortious interference with contract, agency liability and constructive trust. *See generally* Second Amended Complaint, Docket Entry ("DE") [68]. Presently before the Court is defendant BrandForce Health's motions to dismiss plaintiff's Second Amended Complaint for lack of personal jurisdiction or, alternatively, for failure to state a claim upon which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6). *See generally* Motion to Dismiss ("Mot."), DE [74].

For the reasons that follow, the Court denies defendant BrandForce Health's motions, with the exception of defendant's motion to dismiss Trepoint's constructive trust cause of action which is granted.

1

## BACKGROUND

Familiarity with the underlying facts and procedural history of this action, as set forth in the prior decisions of this Court, is presumed and only those facts relevant to the present motion are discussed herein.

### A. Factual Background

Plaintiff alleges the following facts.[1]  In 1999, Flaherty, Bill Commody and non-party Kathy Mitchell started Seismicom, an advertising agency.   Second Am. Comp. ¶ 12.  In 2008, Carmody resigned from Seismicom, sold his equity interest in the company to Flaherty, and formed Trepoint, a corporation organized under the laws of New York with its principal place of business in Great Neck, New York.  *Id.* ¶¶ 1, 14-16.

In November 2010, Flaherty formed BrandForce, a limited liability company organized under the laws of Delaware with its principal place of business in San Francisco, California.   *Id.* ¶¶ 2, 4, 18.  Flaherty is the President, CEO and the sole managing member of BrandForce.  *Id.* In 2011, Flaherty solicited  Carmody to provide services to BrandForce clients, and during that time Trepoint personnel, including Carmody, did a significant amount of work on various BrandForce projects.  *Id.* ¶ 22.  Early in 2012 Flaherty and Carmody discussed a possible partnership arrangement.  *Id.* ¶ 27.  During this time, Flaherty and Carmody met with Dan March and Joe Rizk who were being solicited to join BrandForce Health, which would become a BrandForce affiliate focusing primarily on health care related marketing activities.  *Id.* ¶ 28.  In March 2012, Carmody and Flaherty met in New York to discuss the possibility of merging their

---

[1] Unless otherwise indicated, the following facts are taken from the Second Amended Complaint and are assumed true for purposes of resolving the motions.

companies. *Id.* ¶ 29. Following the meeting, Flaherty introduced Carmody to agency brokerage firms in New York and told the brokers to explore selling a combined agency. *Id.*

While their merger discussions continued, during the week of March 12, 2012, Flaherty and Carmody discussed the value of a marketing opportunity, *viz*. AT&T's "GlowCaps" venture (the "GlowCaps Project") potentially worth $84 million over 3 years, and agreed that they would partner to land the AT&T deal and split the net profits 50-50. *Id.* ¶¶ 30-34. Throughout March 2012, Flaherty and Carmody exchanged more than twenty-five emails and "countless" telephone calls. *Id.* ¶ 35. At Flaherty's request, Carmody flew from New York to California in order to be present at a conference call with AT&T, during which Flaherty introduced Carmody as his partner and BrandForce's Chief Marketing Officer ("CMO"). *Id.* ¶¶ 35-36. On April 2, 2012, Flaherty also submitted BrandForce's Request For Information ("RFI") response to AT&T, which listed Trepoint's employees as employees of BrandForce. *Id.* ¶¶ 37-40. On April 18, 2012, Flaherty informed Carmody that they had been awarded the GlowCaps Project. *Id.* ¶ 42.

Carmody and Flaherty continued their merger discussions throughout May 2012, and while a partnership agreement was not formally memorialized, Flaherty continued to introduce Carmody as BrandForce's CMO on other business pitches. *Id.* ¶¶ 43-46. On June 8, 2012, Carmody, Flaherty and Flarherty's personal attorney met in San Francisco to discuss the structure of their partnership agreement and confirmed that the purpose of the partnership was to allow Flaherty and BrandForce to focus on securing clients while Carmody and Trepoint would focus on client fulfillment and the two firms would share net profits equally. *Id.* ¶¶ 47-48. On June 20, 2012, Flaherty travelled to New York to meet Trepoint's Senior Executive team and attended meetings with two potential business brokers, during which Flaherty explained that they were partners and that the GlowCaps Project would be a springboard for BrandForce to acquire

additional deals through AT&T. *Id.* ¶¶ 49-50. Following the meetings, Flaherty and Carmody attended a launch party for a client in New York City. *Id.* ¶ 51. The following day, Flaherty had additional meetings with Trepoint personnel in New York to discuss the merger. *Id.* ¶ 52. Due to the challenges of completing the a business merger, Trepoint prepared and provided Flaherty with an interim joint venture agreement to cover the AT&T work as well as to cover any new clients. *Id.* ¶ 53.

After Flaherty did not respond, Carmody sent an e-mail to Flaherty confirming the importance of reducing the partnership agreement to writing, to which Flaherty responded that an agreement was already in place. *Id.* ¶ 55. For the next several weeks, "Carmody continued to press Flaherty to sign the joint venture agreement and/or at a minimum, to at least acknowledge the 50-50 partnership split" but Flaherty declined to do so. *Id.* ¶¶ 58-59. Instead, the parties reached an interim agreement by which Flaherty would pay Carmody the unpaid portion of the Seismicom equity sale and Trepoint payments of $540,000 and $800,000 from the initial $4 million AT&T budget. *Id.* ¶¶ 59-60. Flaherty failed to comply with the interim agreement, refused to execute the partnership agreement and attempted to marginalize Trepoint's role on the GlowCaps Project. *Id.* ¶¶ 61-65.

On September 7, 2012, Flaherty claimed that there was no partnership agreement regarding the GlowCaps Project and threatened to terminate Trepoint from further involvement in the AT&T deal. *Id.* ¶ 66. In order to protect the time-sensitive nature of the GlowCaps project, Trepoint transmitted a Statement of Work ("SOW") to BrandForce for $390,000. *Id.* ¶ 67. BrandForce countered that Trepoint should be able to perform the SOW for $85,000, and on September 12, 2012, the parties agreed to reduce the SOW to $250,000. *Id.* ¶¶ 68-71. During these discussions, Flaherty admitted to Trepoint that the reason he had not yet been paid for prior

work on the GlowCaps Project was because Flaherty had diverted the first $165,000 payment from AT&T to an unrelated account and used the second $165,000 payment to pay off a personal debt. *Id.* Flaherty informed Trepoint that he would not be paid until BrandForce received the next installment payment from AT&T. *Id.*

Flaherty formed BrandForce Health, a corporation organized under the laws of California with its principal place of business in San Francisco, California in August 2012. *Id.* ¶ 3. Flaherty is the President, CEO and sole managing member of BrandForce Health. *Id.* At some point after September 11, 2012, Flaherty made a pitch to AT&T on a project known as mPers (the "mPers Project"), listing Carmody as the Chief Marketing Officer for the mPers Project and utilizing Trepoint's economic profile as part of its RFI response. *Id.* ¶ 84. BrandForce and Flaherty then attempted to renege on their promise to plaintiff to share 50% of the profits on the mPers Project by trying to book the deal under the newly formed entity, BrandForce Health, effectively excluding Trepoint from the deal. *Id.*

On September 26, 2012, Carmody e-mailed Flaherty about the unpaid progress payments on the GlowCaps Project and requested that $187,500 be wired to Trepoint's account. *Id.* ¶ 74. Flaherty rejected the request, and on September 28, 2012 Trepoint suspended performance of its joint venture obligations on the project pending payment of past due invoices and adequate assurances. *Id.* ¶¶ 76-80. After several settlement related discussions, Flaherty wired Trepoint $62,500 on October 3, 2012, and Trepoint resumed work. On October 25, 2012, Trepoint again suspended work on the project due to Flaherty's failure to make payment of past due sums and reasonable assurances of future payment for work in progress. *Id.* ¶¶ 80-83.

**B. Procedural Background**

Plaintiff commenced the instant action against BrandForce, Flaherty and BrandForce Health on October 25, 2012.  *See* Compl., DE [1].  Plaintiff filed an Amended Complaint on December 6, 2012.  DE [5].  Defendants filed a motion to dismiss for lack of jurisdiction, DE [17], and on August 29, 2013 the Honorable Judge Feuerstein issued an order granting in part and denying in part the pending motion to dismiss, dismissing only BrandForce Health from the case without prejudice for lack of personal jurisdiction.  [DE] 34.  On February 10, 2014, the parties consented to the undersigned's jurisdiction and the case was reassigned.  DE [57].  Plaintiff filed a motion to amend the First Amended Complaint on March 17, 2014, DE [60], and the Court granted the motion on November 3, 2014, DE [67].  Defendant BrandForce Health now moves to dismiss the Second Amended Complaint against it pursuant to Fed. R. Civ. P. 12(b)(2) and 12(b)(6).  DE [74].  Plaintiff opposes the motion.  DE [75].

## DISCUSSION

### A.  Standards of Review

#### (1)  Fed. R. Civ. P. 12(b)(2)

In deciding a motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), "a district court has considerable procedural leeway.  It may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion."  *Dorchester Fin. Secs., Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (internal quotation marks and citation omitted).  "Where, as here, there has been no evidentiary hearing  and the jurisdictional issue is addressed in affidavits, the plaintiff need only make a *prima facie* showing that the defendant is amenable to personal jurisdiction."  *New York v. Mountain Tobacco Co.,* 55 F. Supp. 3d 301, 311 (E.D.N.Y.  2014) (citation omitted).

"A *prima facie* case requires nonconclusory fact-specific allegations or evidence showing that activity that constitutes the basis of jurisdiction has taken place." *Chirag v. MT Marida Marguerite Schiffahrts,* 604 F. App'x 16, 19 (2d Cir. 2015) (citation omitted); *see Whitaker v. Am. Telecasting Inc.,* 261 F.3d 196, 208 (2d Cir. 2001) ("A plaintiff may carry this burden by pleading in good faith . . . legally sufficient allegations of jurisdiction, *i.e.*, by making a prima facie showing of jurisdiction") (internal quotation marks and citation omitted). "A plaintiff can make this showing through his own affidavits and supporting materials, containing an averment of facts that, if credited, would suffice to establish jurisdiction over the defendant." *Whitaker,* 261 F.3d at 208 (internal quotation marks, citation and alteration omitted). "Where the issue is addressed on affidavits, all allegations are construed in the light most favorable to the plaintiff and doubts are resolved in the plaintiff's favor." *Id.* (internal quotation marks, citation and alteration omitted); *see Robinson v. Overseas Military Sales Corp.,* 21 F.3d 502, 507 (2d Cir. 1994) (while the court "will not draw argumentative inferences in plaintiff's favor, the court must construe jurisdictional allegations liberally and take as true uncontroverted factual allegations") (internal quotation marks and citation omitted). "Personal jurisdiction of a federal court over a non-resident defendant is governed by the law of the state in which the court sits – subject, of course, to certain constitutional limitations of due process." *Henderson v. I.N.S.,* 157 F.3d 106, 123 (2d Cir. 1998) (internal quotation marks and citations omitted).

### (2) Fed. R. Civ. P. 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)); *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt, LLC,* 595 F.3d 86, 91 (2d

Cir. 2010); *see also* Rule 12(b)(6). A claim will have "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S. at 663. A complaint is properly dismissed, where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Twombly,* 550 U.S. at 558.

In considering a motion to dismiss, the court must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *See Matson v. Board of Educ. of City Sch. Dist. of N.Y.,* 631 F.3d 57, 63 (2d Cir.2011); *see also Ruston v. Town Bd. for Skaneateles,* 610 F.3d 55, 59 (2d Cir.2010) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Twombly,* 550 U.S. at 545. "In ruling on a motion pursuant to Fed. R. Civ. P. 12(b)(6), the duty of a court is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Hogan v. Fischer,* 738 F.3d 509, 514 (2d Cir. 2013) (internal quotation marks and citation omitted).

### B. Motion to Dismiss for Lack of Personal Jurisdiction

Defendant BrandForce Health contends that the Court lacks personal jurisdiction over it because BrandForce Health does not have sufficient contacts with New York nor is it an alter ego of Flaherty or BrandForce. Def. Mem. In Supp. at 1, 3-15. Plaintiff, however, asserts that

BrandForce Health is amenable to jurisdiction because of its relationship to Flaherty and BrandForce in that BrandForce Health is a mere shell or alter ego corporation acting at the behest of Flaherty and/or BrandForce. Second Am. Compl. ¶¶ 2-4, 112, Ex. A at 11; Pl.'s Mem. in Opp. at 9-13.

"Where personal jurisdiction over an individual or corporation is proper, such jurisdiction may be extended in order to obtain jurisdiction over a foreign corporation, having no contacts with New York, if the latter is deemed the alter ego of the former." *Miramax Film Corp. v. Abraham,* No. 01 CV 5020 (GBD), 2003 WL 22832384, at *6 (S.D.N.Y. Nov. 25, 2003) (citation omitted) . It is "well established that the exercise of personal jurisdiction over an alter ego corporation does not offend due process." *Southern New Eng. Tel. Co. v. Global NAPs Inc.,* 624 F.3d 123, 138 (2d Cir. 2010) (citation omitted. The Court "need only determine, then, whether [plaintiff] made sufficiently supported allegations that, if proven true, would establish that the [defendant] entit[y] and their parent are alter egos." *Id.*

Generally, to determine which law governs alter ego or piercing the corporate veil analysis in a diversity action, the Court employs the choice of law rules of the forum state. *See In re Coudert Bros. LLP,* 673 F.3d 180, 186 (2d Cir. 2012) ("When a federal district court sits in diversity, it generally applies the law of the state in which it[] sits, including that state's choice of law rules") (citation omitted). In the instant matter, such an analysis is unwarranted as the plaintiff and defendant's submissions rely solely on New York law. Given that "[t]he parties' briefs assume that New York law controls . . . such implied consent . . . is sufficient to establish choice of law." *Krumme v. WestPoint Stevens, Inc.,* 238 F.3d 133, 138 (2d Cir. 2000) (internal quotation marks and citation omitted). Thus, the Court applies New York law to the resolution of this jurisdictional issue.

"Alter ego liability exists when a parent or owner uses the corporate form to achieve fraud, or when the corporation has been so dominated by an individual or another corporation (usually a parent corporation), and its separate identity so disregarded that it primarily transacted the dominator's business rather than its own." *OOO "Garant-S" v. Empire United Lines Co.,* 557 F. App'x 40, 45 (2d Cir. 2014) (internal quotation marks and citation omitted). Under New York law, a party seeking to pierce a the corporate veil and hold another entity or individual liable on a claim against a corporation "must show (i) that the owner exercised complete domination over the corporation with respect to the transaction at issue; and (ii) that such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Network Enterprises, Inc. v. APBA Offshore Productions, Inc.,* 264 F. App'x 36, 40 (2d Cir. 2008) (internal quotation marks and citation omitted); *see USHA Holdings, LLC v. Franchise India Holdings Ltd.,* 11 F. Supp. 3d 244, 266 (E.D.N.Y. 2014) ("[o]n an alter-ego claim for liability, the corporate veil will be pierced if a plaintiff can demonstrate that the alleged dominating party exercised complete dominion over the corporation with respect to the subject transaction and that such domination was used to commit fraud or other wrong which injured [the] plaintiff") (internal quotation marks and citations omitted).

"Typically, piercing analysis is used to hold individuals liable for the actions of a corporation they control." *American Fuel Corp. v. Utah Energy Dev. Co.,* 122 F.3d 130, 134 (2d Cir. 1997); *see Miramax Film Corp.*, 2003 WL 22832384, at *6 (same). Where, as here, a party seeks to hold a subsidiary corporation liable for the actions of its parent, New York law "also recognizes the principle of reverse piercing whereby a corporation may be held accountable for the actions of an individual or another corporation." *Miramax Film Corp.* 2003 WL 22832384, at *6. "Although reverse veil piercing is rare, it may be appropriate in cases where the alter ego

is being used as a 'screen' for the dominating entity." *Id.* (collecting cases); *see Liberty Synergistics, Inc, v. Microflo Ltd.,* 50 F. Supp. 3d 267, 297 (E.D.N.Y. 2014) (same). "[T]he question of whether to engage in reverse piercing depends upon an assessment, in light of the totality of the circumstances of whether the presumption of separate corporate personality is outweighed by the policy of disregarding the corporate form in light of the nature and extent of domination of the corporate entity by an individual." *International Equity Investments v. Opportunity Equity Partners, Ltd.,* 475 F. Supp. 2d 456, 459 (S.D.N.Y. 2007). In such cases, the courts are guided by the same principals governing conventional veil-piercing claims. *Id.*; *see Monteleone v. The Leverage Group,* 2009 WL 249801, at *3-4 (E.D.N.Y. Jan. 28, 2009)

"When determining whether personal jurisdiction exists over an entity alleged to be an alter ego, courts apply a less onerous standard than that necessary to pierce the corporate veil for liability purposes under New York law." *Bank of America v. Apollo Enters. Solutions, LLC,* No. 10 Civ. 3707 (DLC), 2010 WL 4323273, at *4 (S.D.N.Y. Nov. 1, 2010) (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981)). "Specifically, a plaintiff must establish only that one entity was a shell for the other, *i.e.*, that one entity was subject to the complete domination of the other." *Id.* (internal quotation marks and citations omitted). That is, "[i]f a corporation is merely a shell, the corporate veil may be pierced to impute jurisdiction even without a showing that the shell was used to perpetrate a fraud." *Miramax Film Corp.* 2003 WL 22832384, at *7 (citing *Marine Midland Bank,* 664 F.2d at 903)). "The critical inquiry in determining whether a corporation is a shell company is whether it is being used by the alleged dominating entity to advance its own personal interests as opposed to furthering the corporate ends." *Id.* at *8 (internal quotation marks and citations omitted) (collecting cases).

Among the equitable factors courts consider in determining whether a corporation is merely the alter ego or shell of another corporation or an individual are: "(1) the absence of formalities and paraphernalia that are part and parcel of the corporate existence, *i.e.*, issuance of stock, election of directors, keeping of corporate records and the like, (2) inadequate capitalization, (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes, (4) overlap in ownership, officers, directors, and personnel, (5) common office space, address and telephone numbers of corporate entities, (6) the amount of business discretion displayed by the allegedly dominated corporation, (7) whether the related corporations deal with the dominated corporation at arms length, (8) whether the corporations are treated as independent profit centers, (9) the payment or guarantee of debts of the dominated corporation by other corporations in the group, and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." *New York State Elec. and Gas Corp. v. FirstEnergy Corp.,* 766 F.3d 212, 224 (2d Cir. 2014) (internal quotation marks and citation omitted). "These factors are not exhaustive, nor is proof of any one factor or a combination of factors necessarily determinative. Rather, a finding that a corporation is an alter ego of another entity is warranted when doing so will achieve an equitable result." *Miramax Film Corp.* 2003 WL 22832384, at *6 (citing *William Wrigley Jr. Co. v. Waters,* 890 F.2d 594, 601 (2d Cir. 1989)).

At this stage of the litigation, the allegations contained in the Second Amended Complaint and supporting declaration and affidavits referenced in plaintiff's opposition papers show that there exists a sufficient alter-ego relationship between Flaherty, BrandForce and BrandForce Health to establish this Court's personal jurisdiction over BrandForce Health. As an initial matter, the factual allegations support the inference that Flaherty (and/or BrandForce) created,

utilized and controlled the corporate entity BrandForce Health to perpetrate a fraud upon plaintiff. Flaherty formed BrandForce Health in August 2012, BrandForce Health shares the same address with BrandForce at 520 Townsend Street, Third Floor, San Francisco, California 94103, and Flaherty is the President and CEO of both corporate entities. Second Am. Compl. ¶¶ 2-3. The Second Amended Complaint avers that BrandForce Health is a mere agent, instrumentality, or alter ego of BrandForce and Flaherty created solely for the purpose of intentionally depriving Trepoint of profits and economic benefits owed pursuant to the partnership/JV agreement. *Id.* ¶¶ 109-26.

Moreover, with respect to the transaction at issue, the pleadings support the inference that BrandForce Health is a shell company dominated by Flaherty to advance Flaherty's personal interests. In September 2012, defendants pitched the mPers Project to AT&T, listing Carmody as the Chief Marketing Officer for the project and borrowing much of the economic profile of Trepoint as part of its RFI response. *Id.* ¶ 84. However, rather than placing the AT&T project with BrandForce, Flaherty diverted the mPers Project to his newly formed entity, BrandForce Health, in December 2012, and reneged on BrandForce and Flaherty's promise to share 50% of the profits with Trepoint on future AT&T transactions under the partnership agreement. *Id.* Hence, plaintiff has advanced sufficient facts, that if credited, would permit the conclusion that BrandForce Health is the shell or screen through which BrandForce and Flaherty breached their duties to Trepoint by creating and controlling BrandForce Health to act as their "agent" and "vessel" to transact the mPers deal, thereby excluding Trepoint in the mPers Project and its promised share of economic benefits. *Id.* ¶¶ 115-117.

Finally, the interrelationship and overlap of personnel, officers and owners with respect to Trepoint and BrandForce and BrandForce Health vis-à-vis the AT&T deal suggest that

BrandForce Health is a mere department of BrandForce and was completely dominated by that entity. For example, Flaherity's deposition testimony indicates:

(a) Joe Rizk and Dan March (later of BrandForce Health) worked on pitching AT&T on the GlowCaps Project;

(b) BrandForce Health submitted a response to a Request for Information from AT&T in 2012 relating to the AT&T sponsored mPers Project and BrandForce Health landed the project, listing Bill Carmody of Trepoint as BrandForce Health's Chief Marketing Officer notwithstanding that Carmody never held that title at BrandForce;

(c) The RFI response documentation submitted to AT&T with respect to the mPers Project listed both BrandForce and BrandForce Health as having involvement and notes that BrandForce Health was organized by BrandForce and that BrandForce was the 'parent', and borrowed the financial profile of BrandForce and Trepoint along the same lines as the GlowCaps RFI.

Nealon Decl., ¶ 11. DE[60-2]. Notably, the GlowCaps Project launch document circulated on July 9, 2012 lists BrandForce Health as the vendor and lists Bill Carmody of Trepoint as BrandForce Health's Chief Marketing Officer. *Id*. at ¶ 13. Further, Flaherty submitted its September 11, 2012 RFI response to AT&T for the mPers Project on BrandForce Health logo stationery (albeit without reference to "Inc."), and the cover letter suggested it would be a combined effort between BrandForce and BrandForce Health, which Flaherty implied was a subsidiary or division of BrandForce. *Id*. at ¶ 16.

In light of the totality of the circumstances of this case at this juncture, the connections and activities averred between Flaherty and/or BrandForce, as parent, and BrandForce Health, as its subsidiary, are so closely intertwined as to represent an alter ego relationship for jurisdictional purposes. Thus, plaintiff has made a *prima facie* showing that BrandForce Health is amenable to personal jurisdiction as an alleged alter ego of Flaherty and/or BrandForce. Following discovery, it will remain plaintiff's burden to ultimately prove the existence of personal jurisdiction. Accordingly, defendant's motion to dismiss for lack of personal jurisdiction is

denied.

## C. Motion to Dismiss for Failure to State a Claim

In the alternative, defendant BrandForce Health moves to dismiss for failure to state a claim the three causes of action that are asserted against it, namely tortious interference with contract, liability based on agency principles and constructive trust. Each cause of action[2] will be addressed in turn.

### (1) Tortious Interference With Contract

Under New York law, to state a claim for tortious interference with contract the plaintiff must allege "(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the third-party's breach of the contract without justification; (4) actual breach of the contract; and (5) damages resulting therefrom." *Kirch v. Liberty Media Corp.,* 449 F.3d 388, 401 (2d Cir. 2006) (quoting *Lama Holding Co. v. Smith Barney, Inc.,* 88 N.Y.2d 413, 424 (1996)); *see Fire Island Real Estate, Inc. v. Coldwell Banker Residential Brokerage,* 15 N.Y.S.3d 159, 160 (2d Dep't 2015) (same). "[T]o be actionable, the interference must be intentional and not incidental to some other lawful purpose." *Dell's Maraschino Cherries Co. v. Shoreline Fruit Growers, Inc.,* No. 10-CV-3789, 2012 WL 3537009, at *18 (E.D.N.Y. Aug. 14, 2012) (internal quotation mark and citation omitted). "Plaintiff must also allege that the breach would not have occurred 'but-for' the conduct of the defendants." *Friedman v. Wahrsager,* 848 F. Supp. 2d 278, 297 (E.D.N.Y. 2012) (internal quotation marks and citation omitted).

Accepting the allegations in the Second Amended Complaint as true and drawing all

---

[2] The parties have assumed the New York law governs the claims at issue in the instant motion, which is sufficient to establish choice of law. *See Krumme,* 238 F.3d at 138 (when the parties' submissions assume New York law controls, "such implied consent . . . is sufficient to establish choice of law").

reasonable inferences in favor of plaintiff, the Court finds that plaintiff has stated a claim for tortious interference with a contract. Plaintiff alleges that: (1) BrandForce/Flaherty and Trepoint entered into a partnership/joint venture agreement to jointly manage and equally share the profits generated by services to be provided to AT&T, as well as any subsequent derivative work, Second Am. Compl. ¶¶ 85-93; (2) BrandForce Health had knowledge of the partnership contract between Flaherty/BrandForce and Trepoint, *id.* ¶¶ 109-110; (3) BrandForce Health intentionally induced the breach by conspiring with Flaherty/BrandForce to divert the mPers Project and the associated funds away from BrandForce and into BrandForce Health for the purpose of depriving Trepoint of its bargained for 50% participation in AT&T sourced projects, *id.* ¶¶ 111-12; (4) BrandForce Health did appropriate at least one AT&T deal, namely the mPers Project worth at least $4 million, *id.* ¶¶ 109-113; and (5) Trepoint was damaged as a result of BrandForce Health's actions, including Trepoint's right to 50% participation in the mPers Project as well as 50% of the profits and ancillary economic benefits, *id.*

Nevertheless, defendant BrandForce Health argues that the Second Amended Complaint fails to state a claim because it fails to allege that BrandForce Health induced defendants BrandForce or Flaherty to breach the alleged joint venture agreement, and that in any event, the alleged conduct at issue occurred after the alleged breach. BrandForce Health's argument is unpersuasive. "The inducement causing the breach may be any conduct conveying to the third person the actor's desire to influence him not to deal with the other . . . [I]t may be the promise of a benefit to the third person if he will refrain from dealing with the other." *St. John's Univ. v. Bolton,* 757 F. Supp. 2d 144, 173 (E.D.N.Y. 2010) (internal quotation marks and citation omitted); *see Planet Payment, Inc. v. Nova Info. Sys., Inc.,* No. 07-CV-2520, 2011 WL1636921, at *10 (E.D.N.Y. Mar. 31, 2011) ("The procurement portion of a claim of tortious interference

with contract requires that 'but for' the conduct of the defendant, there would not have been a breach which requires that plaintiff to plead that the defendant induc[ed] or otherwise caus[ed] the third-party not to perform the contract") (internal quotation marks and citation omitted).

Plaintiff has set forth specific factual allegations that BrandForce Health induced BrandForce, through its agents, including Flaherty, to transfer and/or place the mPers Project to BrandForce Health in an effort to shield it from the BrandForce-Trepoint partnership/JV agreement and avoid payment of any profits to plaintiff under the agreement. *Cf. MGR Meats, Inc. v. Schweid,* No. 10-CV-3068 (MKB), 2012 WL 6675123, at *3-4 (E.D.N.Y. Dec. 21, 2012) (allegations that defendant induced third party by advising third party not to pay plaintiff and by brokering the transfer of customer accounts sufficiently pled intentional procurement for cause of action for tortious interference with contract under the Rule 12(b)(6) standard). Moreover, the tortious interference cause of action against BrandForce Health is not based on Flaherty's initial avoidance of the partnership/JV agreement, but rather alleges that after Flaherty's creation of BrandForce Health, the agents and officers of BrandForce Health facilitated and induced the breach of the agreement when they conspired to misappropriate the AT&T mPers deal to BrandForce Health rather than BrandForce. *Cf. Omni Food Sales v. Boan,* No. 06-CV-119, 2007 WL 2435163, at *8 (S.D.N.Y. Aug. 24, 2007) ("defendants argue that [the plaintiff] has not alleged this required but-for causation element; but [the plaintiff] has alleged 'as a result of the conspiracy Cargill rejected [the plaintiff] as its actual and potential broker.' At this stage, this allegation is sufficient. [The plaintiff] is certainly not required to prove and establish but-for causation in the Complaint to survive a Rule 12(b)(6) motion");

In sum, plaintiff has sufficiently pled a cause of action for tortious interference with a contract. Accordingly, defendant's motion to dismiss this claim is denied.

### (2) Agency Liability

Under New York law, "an agency relationship results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act." *Bigio v. Coca-Cola Co,* 675 F.3d 163, 175 (2d Cir. 2012) (internal quotation marks and citation omitted); *see In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,* No. 05-MD-1720(JG), 2014 WL 4966072, at *27 (E.D.N.Y. Oct. 3, 2014) (same). That is to say,

> An agency relationship exists . . . when there is agreement between the principal and the agent that the agent will act for the principal and the principal retains a degree of control over the agent. The element of control often is deemed the essential characteristic of the principal-agent relationship. To bind a principal, an agent must have authority . . . . Actual authority arises from a principal's direct manifestations to the agent. It may be express or implied, but in either case it exists only where the agent may reasonably infer from the words or conduct of the principal that the principal has consented to the agent's performance of a particular act.

*Saleh v. Pretty Girl, Inc.,* No. 09 Civ. 1769 (ENV)(RER), 2012 WL 4511372, at *9 (E.D.N.Y. Sept. 28, 2012) (internal quotation marks and citation s omitted); *see Suarez v. City of New York,* No. 11-CV-5812 (SLT)(VMS), 2015 WL 1539737, at *4 (E.D.N.Y. Mar. 31, 2015) (same). "The key inquiry in determining the existence of an agency relationship is whether the principal exercised control over the agent with respect to the matters entrusted to the agent." *Douyon v. N.Y. Med. Health Care, P.C.,* 894 F. Supp. 2d 245, 270 (E.D.N.Y. 2012). "[T]he question of whether or not an agency relationship exists that is sufficient to bind the principal for the acts of the agent is very fact-specific, and no bright-line rules control." *Reynolds v. Xerox Educ. Servs., Inc.,* No. 6:13-CV-1223 (LEK/TWD), 2014 WL 4437622, at *7 (N.D.N.Y. Sept. 9, 2014) (internal quotation marks and citations omitted). Defendant BrandForce Health argues that plaintiff has not stated a viable claim for agency liability because plaintiff has not plead the formal requirements of agency in order to establish liability. The Court disagrees.

Plaintiff avers that Flaherty and BrandForce formed and utilized their control over BrandForce Health, and enlisted BrandForce Health to act as their agent for the purpose of improperly secreting within BrandForce Health, to the exclusion of Trepoint, the 50% economic participation in the mPers deal that Flarherty and BrandForce had previously promised to Trepoint. Second Am. Compl. ¶ 115. Moreover, plaintiff asserts that BrandForce Health accepted the agency relationship and consented to act as the vessel to transact the mPers Project. *Id.* at ¶ 116.

As discussed *supra*, plaintiff has alleged facts to support the inference that BrandForce Health, a subsidiary of BrandForce, was controlled by Flaherty and BrandForce, its parent or principal, such that they were alter egos and/or agents. *See LoCurto v. Jevic Transp., Inc.,* No. 99 CV 2314 (ILG), 2004 WL 469820, at *2 (E.D.N.Y. Jan. 14, 2004) ("In the case of a parent-subsidiary relationship, the same factors informing a judgment regarding the piercing of a corporate veil are applied in determining whether one corporation is acting as the agent of a related corporation"); *Fidenas AG v. Honeywell Inc.,* 501 F. Supp. 1029, 1037 (S.D.N.Y.1980) ("The tests for finding agency so as to hold a parent corporation liable for the obligations of its subsidiary . . . are virtually the same as those for piercing the corporate veil"); *cf. Island Seafood Co. v. Golub Corp.,* 759 N.Y.S.2d 768, 770-71 (3d Dep't 2003) ("Where a corporation is a fragment of a larger corporate combine which actually conducts the business, the larger corporate entity may be held financially responsible for the acts of that corporation," and the court considers the factors for piercing the corporate veil to determine whether "one of the corporations is a mere instrumentality, agent and alter ego of the other"). BrandForce Health acted as an agent of Flaherty and BrandForce in defrauding plaintiff by diverting the mPers

Project and misappropriating plaintiff's share under the partnership/JV agreement of the profits realized. *Id.* at ¶¶ 114-17.

Accepting the allegations in the Second Amended Complaint as true and drawing all reasonable factual inferences in plaintiff's favor, the Court finds that plaintiff has sufficiently pleaded a cause of action for agency liability. Accordingly, defendant's motion to dismiss this cause of action is denied.

### (3) Constructive Trust

Under New York law, a party seeking a constructive trust must generally establish four elements: "(1) a confidential or fiduciary relationship; (2) a promise, express or implied; (3) a transfer made in reliance on that promise; and (4) unjust enrichment." *In re Ades and Berg Group Investors,* 550 F.3d 240, 245 (2d Cir. 2008) (citing *Sharp v. Kosmalski,* 40 N.Y.2d 119, 121 (1976)). The Second Circuit has noted that "[a]lthough these factors provide important guideposts, the constructive trust doctrine is equitable in nature and should not be rigidly limited." *Counihan v. Allstate Ins. Co.,* 194 F.3d 357, 362 (2d Cir. 1999) (internal quotation marks and citation omitted). While it is "[most] frequently . . . the existence of a confidential relationship which triggers the equitable considerations leading to the imposition of a constructive trust," *Sharp,* 50 N.Y.2d at 121, the "constructive trust doctrine is not rigidly limited," *Simonds v. Simonds,* 45 N.Y.2d 233, 241 (1978). However, "New York courts have clarified that [a]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." *In re First Central Fin'l Corp.,* 377 F.3d 209, 215 (2d Cir. 2004) (quoting *Bertoni v. Catucci,* 498 N.Y.S.2d 902, 905 (1986)); *see In re Libor-Based Fin'l Instruments Antitrust Litig.,* No. 11 MDL 2262 NRB, 2015 WL 4634541, at *99 (S.D.N.Y. Aug. 4, 2015) ("in New York [and perhaps some other states] a constructive trust may

not be imposed when money damages are adequate") (citations omitted). Thus, "where a valid agreement controls the rights and obligations of the parties, an adequate remedy at law typically exists" and a constructive trust should not be imposed. *In re First Central Fin'l Corp.,* 377 F.3d at 215.

Plaintiff alleges the following in support of its constructive trust cause of action:

120. As described in detail herein, a partnership/joint venture was formed between plaintiff and defendants.
121. The creation of the partnership/joint venture was formed between plaintiff and defendants.
122. Defendants promised and represented to Plaintiff that it would receive 50% of the profits and ancillary economic benefits arising out of the AT&T relationship.
123. Plaintiff relied on Defendants' promises and representations related to, *inter alia,* the creation of the partnership/joint venture and agreed to split the profits and ancillary economic benefits arising out of the AT&T relationship.
124. Defendants broke their promise, breached their obligations to Plaintiff, and unjustly enriched themselves all to the detriment of Plaintiff.
125. Upon information and belief, BrandForce Health has received or is slated to receive at least $4 million in revenue in connection with the mPers Project and possibly substantially more.
126. At least a portion of the revenue received by BrandForce Health in connection with the mPers Project rightly belongs to Plaintiff. BrandForce Health thus holds that revenue as a constructive trustee.

Second Am. Compl. ¶¶ 120-26.

Plaintiff, however, fails to set forth sufficient allegations to support the imposition of a constructive trust. First, an award of money damages has not been shown to be inadequate to fully compensate Trepoint for the damage it allegedly suffered for the breach of the partnership/joint venture agreement. *See Anwar v. Fairfield Greenwich Ltd,* 728 F. Supp. 2d 372, 420-21 (S.D.N.Y. 2010) ("As plaintiffs have sufficiently alleged numerous federal and state causes of action . . . that may, if successfully proved, yield substantial monetary recovery, there is little the Court can do at this stage in reviewing a cause of action seeking a constructive trust"). Moreover, plaintiff's allegation that BrandForce Health was unjustly enriched by the

revenues and profits it received in connection with the mPers project is duplicative and arises out of the same operative facts not only of plaintiff's claims of tortious interference with contract and agency liability lodged solely against BrandForce Health, but also plaintiff's claims of breach of partnership/joint venture and unjust enrichment against defendants. Accordingly, defendant BrandForce Health's motion to dismiss this claim is granted.

## CONCLUSION

For the foregoing reasons, defendant BrandForce Health's motions to dismiss are denied, except for the motion to dismiss plaintiff's constructive trust cause of action which is granted.

Dated: Central Islip, New York
September 29, 2015

  /s/ Gary R. Brown              
GARY R. BROWN
United States Magistrate Judge